## A92A2054. YOHO v. RINGIER OF AMERICA, INC.
### (427 SE2d 544)

BLACKBURN, Judge.

The appellant, Wilson Gregg Yoho, filed this suit for damages against the appellee, Ringier of America, Inc. ("Ringier"), alleging that he suffered extensive injuries as the result of an explosion which occurred while he was performing services as a laborer for Accu-Rite Machine Company ("Accu-Rite") at a printing plant owned and operated by Ringier. Ringier asserted that it was the statutory employer of Yoho as defined by OCGA § 34-9-8 (a) and, therefore, the only rights and remedies available to Yoho were workers' compensation benefits pursuant to OCGA § 34-9-11 (a). Both parties filed motions for summary judgment. The trial court granted summary judgment to Ringier and denied Yoho's motion, and Yoho appeals.

The facts are undisputed. Ringier operates a large industrial printing plant, including a maintenance department staffed by 45 persons. One of the maintenance department's duties is to service a solvent recovery system located in an area outside the main plant building consisting of a series of large pipes, ducts and tanks designed to remove solvent contaminated air from the printing presses inside the plant to the tanks outside. The solvent-laden air passes through six large metal aftercoolers containing a series of coils which cool the air. In early 1991, engineers at Ringier determined that the aftercoolers needed to be removed and the coils repaired. Because the maintenance department was too busy to undertake the work, Ringier hired Accu-Rite for the job. A crane and operator were also hired independently to lower the aftercoolers to the ground. A critical prerequisite to the repair work was to purge the solvent recovery system of flammable vapors by running a number of blower motors for several hours. This job was entirely Ringier's responsibility.

Accu-Rite was primarily a machine shop with no prior experience in working on solvent recovery systems, so its work was overseen by a Ringier maintenance supervisor, Kelvin Jones. The work was scheduled to be done while the plant was not operating, beginning with aftercooler number 4. Accu-Rite's owner, Charles Merritt, and three employees arrived on Sunday, May 19, 1991, and began the work, but encountered difficulty in removing the bolts from the aftercooler because they were rusted and painted over. When Jones checked on their progress he found they were repairing the wrong aftercooler and directed them to the proper site. Later Jones acquainted Accu-Rite's foreman with an easier method of removing the bolts, provided the

necessary tools which Accu-Rite was lacking, and advised the workers on how to connect the crane cable attachment.

Because it took a full workday to complete the repairs on the first aftercooler, Accu-Rite's foreman suggested to Merritt that he would like to use a torch to burn off the bolts when they removed the next unit. Merritt discussed this with John Oldmixon, another maintenance supervisor for Ringier, who granted permission if Merritt obtained a "hot work permit" from Ringier on the date of the work. Ringier scheduled Accu-Rite and the crane operator to be at the plant the morning of Sunday, May 26, 1991, to remove aftercooler number 5 and replace it with repaired aftercooler number 4, as the plant was to be shut down for Memorial Day weekend. Ordinarily, a boiler tender and a security guard were the only Ringier employees who would have been at the plant, but Jones scheduled Reggie Hilliard to be present as acting supervisor to oversee Accu-Rite's work. Very early that morning, Troy Pinson, Ringier's boiler tender, ran the blowers in the solvent recovery system for several hours to purge it of flammable vapors.

Between 7:00 and 8:00 a.m., Merritt and four Accu-Rite employees (including the appellant) arrived at Ringier and were admitted by the security guard along with the crane operator. Accu-Rite's foreman asked Hilliard if the system had been purged and asked for a hot work permit. Hilliard replied that the system had been purged and a permit would not be necessary. The Accu-Rite employees then commenced work, using a torch to remove the bolts, while Hilliard and Pinson watched. Jones arrived later and discussed various aspects of the work with Merritt. A small grease fire was started by sparks from the torch and put out by Pinson, who obtained a large rubber mat to place over a nearby blower motor to protect it from the sparks. Ringier further provided the Accu-Rite workers with two fire extinguishers, several tools and the gaskets to be put in place when the aftercoolers were reinstalled. Shortly after 10:00 a.m., when all but a few of the bolts had been removed, the explosion occurred in which the appellant was injured.

1. OCGA § 34-9-8 (a) provides that "[a] principal, intermediate, or subcontractor shall be liable for compensation to any employee injured while in the employ of any of his subcontractors engaged upon the subject matter of the contract to the same extent as the immediate employer." Subsection (d) further states that this "Code section shall apply only in cases where the injury occurred on, in, or about the premises on which the principal contractor has undertaken to execute work or which are otherwise under his control or management."

The appellant asserts that the Georgia Supreme Court established in *Manning v. Ga. Power Co.*, 252 Ga. 404 (314 SE2d 432) (1984), that there cannot be a statutory employer pursuant to this

provision unless there are two contracts where one is a subcontract of the other; and that here there are two contracts but no hierarchy of subcontractors or subletting, as Ringier simply has one contract with Accu-Rite to perform a certain task and a separate contract with the crane company to perform another task. The *Manning* court concluded that the "principal" referred to in subsection (a) meant a "principal contractor" as in subsection (d), "and not a principal party to whom an obligation to perform work is owed. Thus, a property owner, although he may be a 'principal,' is not a principal contractor within the meaning of this section and is not a statutory employer who is liable for workers' compensation benefits or immune to tort liability by reason of the exclusive remedy provision of the Act, OCGA § 34-9-11. . . ." Id. at 405.

However, an exception to this rule has since been carved out, which we find applicable here. In *Wright v. M. D. Hodges Enterprises*, 183 Ga. App. 632 (359 SE2d 700) (1987) (grant of cert. vacated, 257 Ga. 613 (363 SE2d 149) (1987)), the circumstances under which an owner may be a statutory employer were clarified: "If the owner is 'merely in possession or control' of the premises upon which the employee of a company under contract to the owner is injured, then the so-called 'bright line' rule would apply. In that event, the owner would not be considered the statutory employer of the injured employee unless the owner also serves as contractor 'for yet another entity' and has hired the injured employee's employer to perform work under that contract on the employer's premises. If, on the other hand, the employer is not 'merely in possession or control of the premises' but is actively involved in the enterprise in which the employee was injured, then the circumstances of the particular case should determine whether the owner is a statutory employer of the injured employee." Id. at 633.

We conclude that under the facts in this case, Ringier served as its own general contractor in the repair and servicing of its solvent recovery system. Just because Ringier operated a printing plant and Accu-Rite was a machine shop, it does not necessarily follow that they could not engage in such a "common enterprise," as appellant argues. As in *Wright*, supra at 634, "defendant owner not only acted as its own general contractor but was also actively involved in the enterprise in which plaintiff was injured. Here, the owner was more than a mere developer who hires others to construct improvements upon his land. The undisputed facts show that defendant acted as supervisor and a supplier of labor for the project. Therefore, summary judgment was properly granted to [Ringier] on the ground [it] was [Yoho's] statutory employer." Accord *Falagan v. Ga. Power Co.*, 205 Ga. App. 531 (422 SE2d 563) (1992); *Travelers Ins. Co. v. McNabb*, 201 Ga. App. 297 (3) (410 SE2d 788) (1991) (cert. den. 201 Ga. App.

904 (1992)); *Fennell v. Max Rittenbaum*, 199 Ga. App. 619 (2) (405 SE2d 546) (1991) (cert. den. 199 Ga. App. 906 (1991)); *Winn-Dixie Atlanta v. Couch*, 193 Ga. App. 352 (387 SE2d 590) (1989) (cert. den. 193 Ga. App. 911 (1989)); *Whitehead v. CHP, Ltd.*, 192 Ga. App. 417 (385 SE2d 124) (1989) (cert. den. 192 Ga. App. 903 (1989)).

2. Relying upon *Ga. Electric Co. v. Rycroft*, 259 Ga. 155 (378 SE2d 111) (1989), the appellant also contends that the contract between Ringier and Accu-Rite was voidable as fraudulently induced because it was entered with the understanding that Ringier would purge its solvent recovery, thus barring any workers' compensation claim. In *Rycroft*, the Supreme Court found that an employee's falsification of his employment application regarding a prior back injury rendered his employment contract voidable, and the employee could not recover workers' compensation benefits for that reason. *Rycroft* has no bearing on the instant case.

The appellant has shown no evidence that Ringier knew or had reason to know that the system contained flammable vapors at the time of the injury. Indeed, Pinson and Hilliard, the two Ringier employees responsible for purging the system, were present at the time of the explosion and were also injured. The evidence may suggest negligence but in no way supports the contention of fraud.

*Judgment affirmed. McMurray, P. J., and Cooper, J., concur.*

DECIDED JANUARY 22, 1993 —
RECONSIDERATION DENIED FEBRUARY 4, 1993 —

*Davis, Gregory & Christy, Hardy Gregory, Jr., Joseph R. Neal, Michael W. Skeen*, for appellant.

*Fulcher, Hagler, Reed, Hanks & Harper, J. Arthur Davison, Hull, Towill, Norman & Barrett, Patrick J. Rice*, for appellee.